# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| GREGORY SCOTT DAILY, ) | Case No. 3:09-bk-05337 |
| ) | Judge Marian F. Harrison |
| Debtor. ) | Chapter 11 |
| ) | |
| ──────────────────── ) | |
| ) | |
| AUERBACH ACQUISITION ) | |
| ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Proc. No. 3:13-ap-90124 |
| ) | |
| JEFFREY GOULD, as Trustee for the ) | |
| Gregory S. Daily Trust f/b/o Austin S. ) | |
| Daily; JEFFREY GOULD, as Trustee for ) | |
| the Gregory S. Daily Trust f/b/o Chase M. ) | |
| Daily; JEFFREY GOULD, as Trustee for ) | |
| the Gregory S. Daily Trust f/b/o Courtney ) | |
| C. Daily; and JEFFREY GOULD, as ) | |
| Trustee for the Gregory S. Daily Trust f/b/o ) | |
| Grayson R. Daily, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF AUERBACH ACQUISITION ASSOCIATES, INC.'S
## RESPONSE TO MOTION TO DISMISS COMPLAINT

Plaintiff Auerbach Acquisition Associates, Inc., for its response to Defendants' *Motion to Dismiss Complaint* (Docket No. 11) (the "*Motion to Dismiss*"), states as follows:

### Introduction

1.  In order to conserve judicial resources, Auerbach originally filed for reimbursement through a simple motion so that this matter could be resolved quickly and easily. Debtor responded by objecting and requesting the Court not reopen the case to hear the motion.

In its objection to the reopening of the case, Debtor made the same arguments that Defendants make here. Those arguments failed and the Court reopened the case.

2. Subsequent to the reopening, Plaintiff notified Defendants that it was still willing to handle this matter as a simple reimbursement motion. Defendants, however, insisted that the matter be handled as an adversary proceeding. Plaintiff reluctantly agreed to accommodate Defendants' preference. Defendants have now filed this motion to dismiss in which they merely repackage the same arguments the Debtor made in his objection to the case reopening.

3. In the *Settlement Term Sheet*, which Defendants signed, Defendants agreed to pay the Estate and thereby provide Auerbach with all the iPayment related interests they held. Defendants did pay over the iPayment GP and LP interests they held but concealed from Auerbach the iPayment bond interests they held. Defendants should be required to pay the bond sale proceeds to Auerbach now. Even after their concealment of the iPayment bond interests was revealed, Defendants refused to reimburse the Estate for the tax bill for the sale of the iPayment bond interests. Defendants did so in defiance of the specific intent of the settlement as articulated by Judge Mashburn.

4. As Auerbach demonstrates below, none of Defendants' arguments have merit and all have already been ruled upon by this Court when it overruled the Debtor's objection to the case reopening. Plaintiff requests that the Court deny Defendants' motion for all the same reasons this Court denied Debtor's assertion of the same arguments.

**Defendants Claim That "all iPayment related interests" Do Not Include iPayment Bonds**

5. Defendants agreed in writing that "all iPayment related interests held by the Daily Estate, the Daily Trusts and any entity related to Greg Daily, including but not limited to GP and LP interests" would be sold and paid to the Estate so that the Estate could pay the proceeds to

Auerbach. Defendants' first argument to evade their obligation is the remarkable claim that the Court should ignore plain language and should accept Defendants' assertion that their iPayment bond interests are not "iPayment related interests." To support their inability to argue the plain language truth that iPayment bond interests clearly fall within "***all*** iPayment related interests" (emphasis added), Defendants focus on different provisions in the *Settlement Agreement* which referenced the actual sale to occur of the iPayment LP and GP interests held by Debtor and Defendants. Defendants argue that because these provisions only talk about the sale of the iPayment LP and GP interests, that somehow trumps and negates Auerbach's having bargained to receive "all iPayment related interests." What Defendants fail to inform the Court is that, of course, there are numerous sections where the settlement agreements discuss the sale of the LP and GP interests --- that is because, as a result of Defendants' concealment, Auerbach only knew of LP and GP interests to be sold. Put another way, of course there was no explicit reference to the sale of the $2.68 million of iPayment bond interests given that Defendants cleverly concealed the existence of the bond interests throughout the discovery process.[1] In fact, the references to the actual sale of the LP and GP interests to which Defendants point actually prove Auerbach's assertion that it knew nothing of the bond interests because, if it had, it certainly would have had no incentive to wait and give Defendants time to engage in fraudulent conveyances and dissipation. What the documents prove is that Auerbach bargained to receive "all iPayment related interests[,]" and, because Defendants concealed the existence of the iPayment bond

---

[1] As Plaintiff demonstrated to the Court during its motion to reopen the case, despite Debtor's claim that the Daily Trusts fully notified Auerbach of the existence of the iPayment bond interests and despite this Court postponing its ruling on the reopening in order to give Debtor and Defendants weeks to prove that claim, they were unable to support their claim. In fact, the only thing the Debtor and Defendants were even able to come up with were a couple of buried obscure references in a brokerage statement that was itself buried amidst tens of thousands of pages of discovery. Despite this Court giving the Debtor and Defendants ample time, they failed to support their claim of disclosure and so the case was reopened.

interests, Auerbach believed that the only iPayment related interests that were available to be sold were the LP and GP interests. Thus, the only discussions of actual sale proceeds from iPayment related interests revolved around the sale of the LP and GP interests.

6. In fact, Defendants fail to inform this Court that there is a simple fact that completely disproves Defendants' claim that "all iPayment related interests" was limited only to iPayment LP and GP interests: the very provision that provides Auerbach with "all iPayment related interests" makes *crystal clear* that iPayment related interests are not limited to LP and GP interests. The provision states:

> provided that all iPayment related interests held by the Daily Estate, the Daily Trusts and any entity related to Greg Daily, *including but not limited to GP and LP interests*, shall be sold by the Trustee and an amount equal to all proceeds from such sale shall be used to make payments to the Daily Estate[.] (emphasis added).

7. Defendants know all too well that if "all iPayment related interests" was the same thing as LP and GP interests, then the provision would not have said "all iPayment related interests held by the Daily Estate, the Daily Trusts and any entity related to Greg Daily, *including but not limited to* GP and LP interests." (emphasis added). Plaintiff is of the opinion that instead of wasting this Court's time by briefing how the dictionary supports that bond interests are not the same thing as LP and GP equity interests, Defendants should have acknowledged from the beginning that the Settlement Agreement specifically extends Auerbach's rights beyond GP and LP interests to the entire universe of "all iPayment related interests."

8. Defendants apparently knew that it was likely that Auerbach would bring this important language to the attention of the Court because they also argue that any inconsistency between the language that Auerbach relies upon and the fact that there were no references to the

4
Case 3:13-ap-90124  Doc 16  Filed 05/24/13  Entered 05/24/13 16:55:20  Desc Main
Document  Page 4 of 17

sale of iPayment bond interests should be resolved in favor of concluding that "all iPayment related interests" should mean only LP and GP interests. However Defendants are merely mischaracterizing their successful concealment as inconsistency. There is nothing inconsistent with Auerbach having negotiated for broad entitlement to all iPayment related securities on the one hand but then not crying foul when it saw that the only securities that were going to actually be sold were the GP and LP interests. That is precisely how documents would read if one party concealed that there were some iPayment related interests to be sold beyond just the GP and LP interests. However, the law does not reward concealment but penalizes it. Auerbach never knew there were any iPayment bond interests to be sold; so, it could not have known to cry foul. The record demonstrates that Auerbach insisted on broad language that extended beyond GP and LP interests to "all iPayment related interests" just in case there were any subsequent surprises --- which of course there were as a direct result of Defendants' concealment.

9. Defendants' attempt to explain away the purpose and intent of the "all iPayment related interests" language is completely contradicted by the document itself.[2] The *Settlement Term Sheet* makes crystal clear that the sale of all iPayment related interests was intended to generate proceeds to pay Auerbach its Initial and Final Purchase Payment. The *Settlement Term Sheet* states:

> provided that all iPayment related interests held by the Daily Estate, the Daily Trusts and any entity related to Greg Daily, including but not limited to GP and LP interests, shall be sold by the Trustee and an amount equal to all proceeds from such sale shall be used to make payments to the Daily Estate (including the

---

[2] Defendants' assertion that Auerbach never complained about the transfer of Extraordinary Receipts to Defendants prior to the case closing also makes no sense. Defendants seem to repeatedly misunderstand that when one party engages in fraudulent concealment, it is understandable that another party will undertake multiple actions as a result of and in sheer ignorance of the concealment. That does not provide waiver to the concealing party --- that provides evidence that the concealment was successful and explains why the injured party could not have known to file its claims earlier.

$17.5 million to purchase Non-iPayment Assets) *in order to fund distributions to the unsecured creditors of the Daily Estate, including the Initial Purchase Payment and Final Purchase Payment to Auerbach*. (emphasis added).

10. Defendants are also incorrect when they argue that the provision to provide Auerbach with "all iPayment related interests" is rendered no longer "operative" (*Motion to Dismiss*, p. 12). Auerbach did not complain when it saw references to only GP and LP interests being sold throughout implementation of the plan, because Auerbach believed that the GP and LP interests is all that was available to be sold. Once again Defendants are merely attempting to profit from their concealment. Not only are Defendants' arguments incorrect and contradicted by the settlement agreements themselves, but their arguments raise a troubling spotlight on Defendants' conduct: since Defendants obviously knew they were sitting on $2.68 million in bonds, why would they have ever signed their names to a requirement to pay to Auerbach "all iPayment related interests" without insisting on an exclusion for the bonds. At a minimum, if they genuinely thought that the intent of the parties was never that Auerbach would get bond proceeds, why would Defendants permit such a massive controversy to be created. Why did Defendants not insist the language be changed to say all iPayment related interests which shall not include the Daily Trusts' iPayment bond interests. The inference is clear --- Defendants knew that Auerbach was insisting on receiving all iPayment related interests and knew that if they proposed any language excluding the bond interests Auerbach would be alerted to the existence of the bond interests and would not agree to their exclusion. The Debtor and Defendants were represented by savvy counsel, and they knew by agreeing to language stating "including but not limited to GP and LP interests" they were all obligating themselves to give Auerbach the bond interests. Instead of forthrightly notifying Auerbach of the bonds *before* signing the Settlement Term Sheet, Defendants chose to conceal the bonds and take their chance on Auerbach ever

learning about them or ever being able to persuade the Court to disgorge Defendants of the proceeds.

11. What a simple reading of the settlement agreements does prove is what Auerbach has been saying all along: Auerbach bargained to receive all iPayment related interests which included *but was not limited to* LP and GP interests as well as any other type of iPayment interest, such as iPayment bond interests. Defendants, however, concealed from Auerbach the fact that iPayment bonds existed and so Auerbach never had reason to cry foul when it saw references to only the sale of GP and LP interests. Then, after the bankruptcy case closed, when the Estate's final tax return had to be filed, Auerbach learned for the first time of the bond interests because Defendants not only sold the bonds but refused to pay the tax obligation. Upon learning of the existence of the bond interests, Auerbach promptly and properly moved to have the settlement enforced and the bond proceeds paid to Auerbach or, in the alternative, have the tax bill reimbursed to Auerbach if the Court were to permit Defendants to keep the bond proceeds.

**Defendants Argue They Are Released From All Breaches of the Settlement Term Sheet**

12. In order to effect the settlement, Judge Mashburn created two documents, the first called the *Purchase and Compromise Agreement* which contained the releases upon which Defendants now rely and which Auerbach signed on March 3, 2011, and the second called the *Settlement Term Sheet* which required Defendants to pay Auerbach all iPayment related interests and which states that it is effective a day later --- as of March 4, 2011. Defendants now argue to this Court that the release they received when Auerbach signed the first document on March 3, 2011, was intended to waive, invalidate and nullify all of Defendants' obligations in a separate agreement that only became effective a day later, on March 4, 2011. Defendants therefore argue

to this Court that Judge Mashburn naively erected two agreements to be signed nearly concurrently in which a release signed on March 3rd, 2011, meant that everything Defendants obligated themselves to a day later on March 4th, 2011, was illusory. Thus, Defendants argue that even if they did owe the bond interest proceeds to Auerbach, they are released from their breach and concealment because they received a release a day before agreeing to make that payment. Even assuming essentially concurrent signing, Defendants ask this Court to believe that Judge Mashburn erected a mechanism by which all of Defendants' obligations were illusory.

13. Not only does the timing of the execution of the two documents render Defendants' argument outrageous on its face, Defendants fail to inform the Court that the release in question contains language that specifically precludes their argument. The release stat*es* "excluded from this release are **the obligations of the Daily Group and the Daily Extra Releasees set forth within this Agreement, including but not limited to the Bankruptcy Estate's obligation to pay Auerbach the Final Purchase Payment** and the obligations of the Daily Group pursuant to Section 1.3 herein." (*Purchase and Compromise Agreement*, Doc. 782-2, p. 5) (emphasis added). Thus, making sure that the estate paid the Final Purchase Payment to Auerbach was specifically defined as an obligation of "the Daily Group and the Daily Extra Releasees." Thus, by signing their names, Defendants acknowledged that it was *their* obligation to ensure that the Bankruptcy Estate paid Auerbach both the Initial and Final Purchase Payment --- which of course makes perfect sense since Defendants were agreeing to undertake actions such as the sale of all iPayment related interests to make sure Auerbach received its full Final Purchase Payment. Moreover, each of the Defendants fit squarely within the definition of "the

Daily Group and the Daily Extra Releasees."[3] Therefore, not only did Defendants acknowledge that it was their obligation to see to it that Auerbach was paid the Final Purchase Payment, but this obligation was specifically excluded from the release. Defendants also fail to inform the Court that to pay Auerbach the Final Purchase Payment meant paying to Auerbach the proceeds from the sale of all iPayment related interests, which includes the bond interests.[4] Thus, to even get the benefit of the release, the Defendants obligated themselves to ensure that Auerbach received the proceeds from the sale of all iPayment related interests. Simply put, by the very language of the release, Defendants do not get the benefit of the release in any environment in which the Final Purchase Payment has not been paid in full to Auerbach --- and it cannot be paid in full until Defendants pay Auerbach the proceeds from the sale of the bond interests.

14.     Defendants seek to obtain the benefit of the *Purchase and Compromise Agreement*, specifically its releases, while at the same time breaching it. Not only is this unsupported by all tenets of contract law, but the language of the release itself specifically precludes Defendants from making this argument. Also supporting the fact that Defendants should have in all circumstances paid the tax on the bond sale proceeds, it should be noted that *nowhere* in the pre-approved expenditures for the Estate contained in the *Purchase and*

---

[3] Ironically, Defendants argue that they only signed the *Purchase and Compromise Agreement* "solely for the limited purpose of agreeing to the release provisions in Section 3" (*Motion to Dismiss*, p. 14), but they fail to inform the Court that it is in the release provisions in Section 3 that Defendants were required to acknowledge that the Estate's payment to Auerbach of the Final Purchase Payment was also their obligation.

[4] The *Settlement Term Sheet* makes absolutely clear that the sale of all iPayment related interests was to fund the Final Purchase Payment when it states: "provided that all iPayment related interests held by the Daily Estate, the Daily Trusts and any entity related to Greg Daily, including but not limited to GP and LP interests, shall be sold by the Trustee and an amount equal to all proceeds from such sale shall be used to make payments to the Daily Estate (including the $17.5 million to purchase Non-iPayment Assets) ***in order to fund distributions to the unsecured creditors of the Daily Estate, including the Initial Purchase Payment and Final Purchase Payment to Auerbach***." (emphasis added)

*Compromise Agreement* is there any mention of taxes owed on the sale of iPayment bonds. Thus, Defendants further breached the *Purchase and Compromise Agreement* by forcing the Estate to pay a tax obligation which was not part of the agreed subtractions in calculating the Final Purchase Payment. Therefore, by Defendants not providing to the Estate the sale proceeds of the iPayment bonds, and by not alternatively reimbursing the estate for the tax on the iPayment bonds, Defendants twice violated the *Purchase and Compromise Agreement* and cannot avail themselves of the release.

15. As further evidence of the lack of merit in Defendants' arguments, it goes without saying that Judge Mashburn would not have emailed Plaintiff's counsel advising him to rely on his ability to seek reimbursement in the event any unexpected tax events arose if Judge Mashburn thought that the settlement he had erected contained a circular trap in which Plaintiff could never obtain reimbursement because of the release. (*See* Mashburn and Mendes emails, Exhibit 1)

16. The brazenness of Defendants' release argument merits highlighting. Defendants are trusts that the Debtor erected to engage in fraudulent conveyances of assets to evade his fraud judgment. Defendants were always under the control of Debtor. Debtor's counsel in the bankruptcy case regularly spoke on behalf of both the Debtor and the trusts. Nevertheless Defendants' release argument boils down to Defendants saying to this Court that even if they did fraudulently conceal the existence of the iPayment bonds, and even if the *Settlement Term Sheet*, which Auerbach signed after signing the releases, required the bond proceeds to be paid to Auerbach, and even if Defendants breached the *Purchase and Compromise Agreement* --- which itself contained the releases --- by not paying either the bond proceeds or tax bill over to the Estate, Defendants should have the benefits of the release while depriving Auerbach of the
10

*Compromise Agreement* is there any mention of taxes owed on the sale of iPayment bonds. Thus, Defendants further breached the *Purchase and Compromise Agreement* by forcing the Estate to pay a tax obligation which was not part of the agreed subtractions in calculating the Final Purchase Payment. Therefore, by Defendants not providing to the Estate the sale proceeds of the iPayment bonds, and by not alternatively reimbursing the estate for the tax on the iPayment bonds, Defendants twice violated the *Purchase and Compromise Agreement* and cannot avail themselves of the release.

15. As further evidence of the lack of merit in Defendants' arguments, it goes without saying that Judge Mashburn would not have emailed Plaintiff's counsel advising him to rely on his ability to seek reimbursement in the event any unexpected tax events arose if Judge Mashburn thought that the settlement he had erected contained a circular trap in which Plaintiff could never obtain reimbursement because of the release. (*See* Mashburn and Mendes emails, Exhibit 1)

16. The brazenness of Defendants' release argument merits highlighting. Defendants are trusts that the Debtor erected to engage in fraudulent conveyances of assets to evade his fraud judgment. Defendants were always under the control of Debtor. Debtor's counsel in the bankruptcy case regularly spoke on behalf of both the Debtor and the trusts. Nevertheless Defendants' release argument boils down to Defendants saying to this Court that even if they did fraudulently conceal the existence of the iPayment bonds, and even if the *Settlement Term Sheet*, which Auerbach signed after signing the releases, required the bond proceeds to be paid to Auerbach, and even if Defendants breached the *Purchase and Compromise Agreement* --- which itself contained the releases --- by not paying either the bond proceeds or tax bill over to the Estate, Defendants should have the benefits of the release while depriving Auerbach of the

benefits of the consideration. Of course Defendants cite no law for such a proposition, because none exists.

### Defendants' Claim Regarding the Tax Bill

17. Next, Defendants argue they should be permitted to keep the iPayment bond proceeds and stick Auerbach with the taxes because the *Settlement Agreement* nowhere specifically references tax obligations from the sale of iPayment bonds. But of course there is no specific reference to the tax obligation from the iPayment bonds because Defendants concealed from Auerbach the existence of the iPayment bonds. What Defendants fail to concede to the Court, however, is that throughout the *Settlement Term Sheet*, there are continual references to the Defendants having to pay any associated tax on any assets they are keeping (*Settlement Term Sheet*, pp. 6 and 8). In fact, throughout the Settlement all parties accepted the tax obligations of proceeds they received.

18. So long as Judge Mashburn was going to remain trustee, Auerbach was not concerned about the aforementioned principles being enforced because Auerbach was confident that Judge Mashburn would properly enforce the Settlement. Once Auerbach learned of Judge Mashburn's appointment to the bench, however, Auerbach became concerned that Daily could attempt to take advantage of Judge Mashburn's absence. Specifically, Auerbach was concerned that given the way Daily set up these trusts to effect his fraudulent conveyances, Daily might attempt to have his trusts accept a gain while improperly sticking the tax liability onto the Estate. Accordingly, Auerbach asked Judge Mashburn to record in writing the requirement that the Daily Trusts reimburse the Estate for any tax liabilities for proceeds they are retaining. Judge Mashburn provided Auerbach with the comfort it sought. Specifically, on December 16, 2011, Auerbach's counsel emailed Judge Mashburn stating:

> One thing that occurred to me is that while the three of us were in agreement that Daily would need to pay any tax consequences from the GRAT from Jan 1st to closing since he took all the benefits of the GRAT, should we be concerned regarding his creditworthiness if there are any tax consequences? That concern occurred to me while we were chatting because I got the impression that Daily was structuring himself to be judgment proof in the future. Perhaps this is moot since there may be no tax consequences from the GRAT, but if you think this is something we should be concerned about, please let me know. (Exhibit 1).

19. This Court is requested to note that Auerbach's counsel's email specifically referenced his conversation with Judge Mashburn in which Judge Mashburn confirmed Auerbach's interpretation of the Settlement that the recipient of proceeds pays the tax. Removing any shadow of doubt, on December 16, 2011, Judge Mashburn emailed Auerbach's counsel back stating:

> I believe the settlement agreement obligates the Daily Trusts rather than Greg Daily individually to reimburse the bankruptcy estate in the event there are any unintended tax consequences of the type you mentioned. Therefore, I don't really understand the concern about the creditworthiness of Daily individually. (*Id*.).

20. This Court is requested to note that Judge Mashburn extended his commentary to "the Daily Trusts" and not just the GRATs because the same principle applied: if any of the Daily Trusts was keeping proceeds it had to be responsible for the tax consequences of any gains it was retaining.

21. This Court is also requested to note that Judge Mashburn wrote this email months after the March 2011 releases were signed, and nowhere does Judge Mashburn express any concern that the Daily Trusts (i.e. the Defendants in this action) were released from their obligation to reimburse for tax consequences --- thus providing further evidence of the emptiness of Defendants' release argument. To the contrary, Judge Mashburn explicitly states that the Daily Trusts have a surviving obligation to reimburse for unintended tax consequences for proceeds they kept.

22. With Judge Mashburn's oral assurances and email response, Auerbach was satisfied that, notwithstanding Judge Mashburn's appointment to the bench, Auerbach could prove that the intent of the parties was that the Daily Trusts be obligated to reimburse the Estate for tax liabilities on proceeds they were keeping. Yet, Defendants now argue that there is no merit to Auerbach's assertion that he who keeps the proceeds must pay for the taxes associated with those proceeds. Judge Mashburn's email, however, definitively proves that was the intent of the parties, and it is the intent of the parties that the law requires be enforced.

### Defendants' Argument on Standing

23. Defendants argue that Plaintiff was required to have objected to the Successor Trustee's payment of the taxes. Defendants fail to inform the Court that in his email, Judge Mashburn specifically laid out to Plaintiff that the proper mechanism would be for Plaintiff to seek to be "reimbursed" which is precisely what Auerbach has done. (Exhibit 1). Defendants also fail to notify the Court that in light of Judge Mashburn's prescription for seeking reimbursement, Plaintiff and the Successor Trustee agreed that because the IRS would require payment while the parties worked out the issue of reimbursement, Auerbach would not object to the Successor Trustee paying the taxes and the Successor Trustee would agree that such non-objection is without prejudice to Auerbach's rights to follow Judge Mashburn's prescription and seek reimbursement.

24. Defendants' standing argument also overlooks the fact that Auerbach is a creditor that is provided for in the *Plan* and is a signatory to both the *Settlement Term Sheet* and *Purchase and Compromise Agreement*. It has been injured by a breach of both. In addition, this Court has the power to remedy that injury. As such, Auerbach has standing to seek payment of the required amounts. Without citation and any legal support whatsoever, Defendants argue that only the

Successor Trustee has standing to pursue an action to remedy a breach against Auerbach. As the Successor Trustee has already explained to this Court, however, during the motion to reopen the case, his fees were capped and there is therefore no mechanism or financial incentive for him to pursue an action. On that basis, this Court already resolved this standing argument and reopened the case so that Auerbach could seek reimbursement. Thus, Defendants' argument flies in this face of both this Court's findings, this Court's order of January 18, 2013, Auerbach's agreement with the Successor Trustee, and Judge Mashburn's prescription on the proper way to proceed.

### **Defendants' Claim of Res Judicata**

25. Defendants rest their claim of res judicata on their assertion that "Auerbach could and should have brought its claims relative to the Daily Trusts' iPayment bonds and the tax implications arising from the redemption of such bonds during the bankruptcy proceedings." (*Motion to Dismiss*, p 18). However, this claim is baseless because Auerbach did not even know about the existence of the iPayment bonds until after the bankruptcy case closed and the final tax return was filed. Moreover, the tax bill only arose in conjunction with the filing of the estate's final tax return which indisputably came after the bankruptcy case closed. Thus, Defendants arguments are meritless because Auerbach could not have brought claims about bonds it did not know existed and about tax bills that did not even yet exist.

26. In his opposition to Auerbach's motion to reopen the bankruptcy case, the Debtor argued res judicata and argued that Auerbach was made well aware of the existence of the iPayment bond interests before the bankruptcy case was closed. As a result of that argument, this Court delayed its ruling on Auerbach's motion to reopen by over a month in order to provide the Debtor and the Daily Trusts with ample time to comb their files and prove that assertion. The Debtor and the Daily Trusts were well aware of the opportunity the Court was affording them to

prove forthright disclosure of the bond interests in order to prevent the case from being reopened and end Auerbach's effort for reimbursement. Nevertheless, the Debtor and his Trusts utterly failed to back up the Debtor's claim and thereby proved Auerbach's assertion of concealment. Amidst the countless emails, letters and documents surrounding this case, the only reference that the Debtor could come up with was a couple of obscure references on a brokerage statement that was itself buried amidst literally tens of thousands of pages of discovery.[5] What was powerful was not only the Debtor's inability to provide documents evidencing disclosure, but the fact that no mention of the multi-million dollar bond interests could be found in *any* of the bankruptcy schedules or lists of assets produced by the Debtor and his family. Moreover, these were not just any run of the mill securities, these were bond interests in the very company, iPayment, that the Debtor stole from Plaintiff and which resulted in a $350 million fraud judgment against the Debtor. These were bond interests in a company that was at the center of the entire controversy and which the Debtor fraudulently conveyed to trusts in order to evade his fraud judgment. Yet despite the emotionally charged nature of these bond interests and the fact that the Court afforded Debtor weeks to search his records to come up with evidence of disclosure, the record demonstrated that none of these bond interests were ever listed in any of the Debtor's or his family's bankruptcy schedules or lists of assets. The direct implication was that the Debtor concealed the bonds from the countless number of places in which he could have and should have properly disclosed them. Upon the Debtor failing to meet his burden and support his claim of disclosure, this Court ruled that the case would be reopened. Defendants' decision to repeat

---

[5] The Court will recall that the undersigned explained that despite his extensive involvement in every aspect of the case, the existence of these bond interests had not been made known to him by the Debtor.

15
Case 3:13-ap-90124    Doc 16    Filed 05/24/13    Entered 05/24/13 16:55:20    Desc Main
Document      Page 15 of 17

this res judicata argument without having offered any new documentary evidence is just repackaging an argument that already failed.

27. Defendants and the Debtor undoubtedly have a material incentive to find any written communication that would demonstrate forthright disclosure of the existence of the iPayment bonds. Defendants no doubt used the intervening months since Debtor's failed res judicata argument to revisit their files and search for any supporting document. Yet, by still failing to provide this Court with anything proving disclosure, Defendants have once again demonstrated that they concealed the existence of the iPayment bond interests despite their obligation to forthrightly notify Auerbach's counsel.[6]

28. Finally, it defies imagination how Defendants could argue that Auerbach would have ever sat on its hands. Given Daily's prolific history of fraudulent conveyances to make himself judgment proof, Auerbach would not have wanted to incur the dissipation risk of letting the Defendants hold the proceeds for one second. Moreover, Auerbach would have obviously preferred to have this matter handled while Judge Mashburn remained trustee given his supportive communications with Plaintiff's counsel on the matter. This Court was correct in reopening the case and Defendants' failure to come with anything in the intervening months demonstrates the correctness of this Court's prior ruling on res judicata.

## **Conclusion**

29. Each of the arguments presented by Defendants are ones which Debtor presented to the Court in his objection to the reopening of the case. Debtor had access to all the same

---

[6] As Auerbach briefed when defeating the Debtor's res judicata argument, the *Settlement Agreement* stated that any modification had to be made in writing, and any default could only be waived in writing. Thus, given that Defendants knew they held the bonds, they were under an obligation to present to Auerbach their arguments as to why they should be permitted to keep the bonds and either obtain a written waiver from Auerbach or permit Auerbach to litigate the issue while the case was still open.

documents then as Defendants do now. Defendants' arguments fail now for all the same reasons they failed then.

Respectfully Submitted,

/s/ Robert J. Mendes
Robert J. Mendes (rmendes@fbtlaw.com)
Frost Brown Todd LLC
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
615.251.5550
615.251.5551 Fax

ATTORNEY FOR PLAINTIFF AUERBACH
ACQUISITION ASSOCIATES, INC.

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true and exact copy of the foregoing has been served on the parties consenting to electronic service in this case on this the 24th day of May, 2013.

/s/ Robert J. Mendes
Robert J. Mendes